(No. 23270.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* MORRIS RAPPAPORT, Plaintiff in Error.

*Opinion filed February 14, 1936.*

Simon Herr, for plaintiff in error.

Otto Kerner, Attorney General, Thomas J. Courtney, State's Attorney, and A. B. Dennis, (Edward E. Wilson, John T. Gallagher, and Richard H. Devine, of counsel,) for the People.

Mr. Justice Jones delivered the opinion of the court:

We are called upon, by this writ of error, to review a conviction of Morris Rappaport, in the criminal court of Cook county, of the crime of manslaughter. The indictment charged murder.

Harry Silverstein was shot and killed at the rear of the Central Park Theater in Chicago on January 4, 1931. He was about twenty-five ·years old and was known as "Troubles" and "Red Iodine." Defendant, Rappaport, was twenty years old and was formerly employed at the theater. He was on the back of the stage that night with several others, including Herbert Imlach, the theater electrician, Irving Riffkind and Robert Ross. About 8:30 P. M. Bob Lewis, who did not testify, came in, walked over to de-

fendant and said something to him. According to Imlach, Lewis said "Troubles is coming looking for you." Ross testified that he said "Red Iodine is outside," and according to Riffkind, Lewis said "Somebody wants to see you outside." Riffkind testified that defendant then said "I will fix him."

All of them testified that defendant, after Lewis had talked with him, arose from his chair and went to an exit at the southeast corner of the building, which opened on a ramp along the side of the theater, and that within a few minutes two shots were heard. The witnesses rushed down the stairway leading to the exit and saw Silverstein grappling or fighting with defendant in the doorway. Imlach testified that there was a gun on the ground for which they were both reaching and struggling. Ross and Riffkind did not see any gun. Immediately after the homicide, defendant ran away. He was apprehended at Mansfield, Ohio, in February, 1935.

Robert Ross, a witness for the People, testified that when defendant was told that Red was outside, he immediately got up and started to leave the building. He had left his car in an alley close to the back entrance of the theater. He was proceeding in that direction when he encountered Silverstein at the doorway. The witness testified he heard shots and ran to the doorway where he found Silverstein had grabbed defendant and that defendant was trying to get away. Ross parted the men and entreated Silverstein not to start anything. Silverstein laughed but called defendant dirty names. He struggled to get away from the witness and in doing so struck the witness. Thereupon a shot was fired which hit and killed Silverstein. Ross did not see the shot fired.

Imlach and Riffkind testified they saw defendant fire the fatal shot from the doorway. Riffkind testified that defendant then said "I got him." At the coroner's inquest, a few days after the killing, Imlach testified that when he

saw the revolver on the ground he ran back into the theater and heard what he imagined was a shot; that he was told it was a shot but was so excited he did not know whether it was or not.

Riffkind testified on direct-examination that he came to the theater with Ross. On cross-examination he changed his story and said he came from his home to the theater alone. He then said he went first to Ross's home and from there to the theater looking for Ross. He also testified that just before the shot was fired defendant came back into the hallway, grabbed an ax from the wall and ran toward the exit with it. Imlach, Ross, Riffkind and others were present when Lewis warned defendant that Silverstein was looking for him. They were present when the fight took place and until defendant ran away, yet nobody corroborated Riffkind's testimony as to the ax or as to defendant's alleged statements before and after the fight.

Defendant claims he was in great fear of Silverstein and acted in self-defense. The testimony shows that from the time defendant was in high school up to the time of the killing, Silverstein repeatedly committed unprovoked assaults upon him. As a result of one of them, defendant bears a scar on his underlip, and from another beating his tongue was so badly cut it had to be sewed. On one occasion, while defendant was in his automobile in front of a public garage, Silverstein attempted to get into the car to assault him. Defendant fired through the window of the car. He testified that Silverstein was trying to strike him with a wrench; that he fired to one side to frighten him, and had carried a gun for self-protection since Silverstein's threats to kill him. On other occasions, Silverstein ran defendant into garages and other buildings, and told him he would not rest until he killed him. Silverstein was five feet ten inches tall and weighed 180 pounds, while defendant was five feet five inches high and weighed but 115 pounds. He

did not owe Silverstein, there was no trouble between them over love affairs and no family feud. The assaults were without justification and the evidence shows defendant was never the aggressor, but fled, on several occasions, to avoid a beating. He caused some of his friends to intercede with Silverstein to induce him to let him alone. They were unsuccessful, and Silverstein said he meant to break defendant's back the first time he saw him and to knock his head off before he got through with him. These threats were communicated to defendant and he testified that he was in fear of his life or great bodily harm from Silverstein. His testimony as to the assaults, and the attempts of his friends to induce Silverstein to let him alone, was corroborated by other witnesses and is not controverted.

On the night of the homicide, defendant and some others played cards in the theater for awhile and he afterwards played solitaire. He testified that when Lewis told him "Troubles is coming into the theater for you," he immediately ran to the stage entrance to get away; that it was dark outside and as soon as he opened the door and stepped into the alley, Troubles felled him with a powerful blow, wedging him between the outside and inside door; that Troubles came toward him again and they grappled; that the gun was in the pocket of his coat; that Troubles tore the pocket and the gun fell on the ground; that they both reached for it and in the struggle the gun was discharged; that he believed he was in danger of great bodily harm from Silverstein; that he did not see Ross, Riffkind or Imlach there at that time; that two shots were not fired upon his leaving the theater and another later; that he did not take an ax off the wall, and thought only one shot was fired; that he left the gun on the ramp where it dropped after the shooting; that he immediately ran away, went to New York, assumed the name of Milton Stein, and traveled with a New York salesman through five or six States until he was arrested at Mansfield, Ohio.

It is not disputed that defendant left the gun at the scene of combat. The testimony of all the witnesses tends to corroborate his story that the gun was in his pocket and fell to the ground when Silverstein tore the pocket. If more than one shot was fired from it, that fact could have been shown. The gun was not produced by the prosecution nor was any effort made to show why it was not available. Moreover, Riffkind admitted that the noise of shots was a part of the moving picture then being produced in the theater. It is not to be expected that the testimony of eye-witnesses to a controversy will agree in every particular, but, in order to sustain a conviction in a criminal case, the testimony must be sufficient, with all its discrepancies, to establish, beyond a reasonable doubt, the guilt of the defendant. In view of Imlach's denial at the inquest of having seen the defendant fire the fatal shot, his story at the trial four years later that he did see it, should greatly discredit his testimony. Riffkind's story of the occurrence is so at variance with that of the other witnesses as to make it of doubtful value. The testimony of Ross at the inquest and on the trial was contradictory.

While it is the province of the jury to pass upon the question of guilt or innocence of an accused in the first instance, it is the duty of this court, upon review, to consider the evidence, and if as a whole it does not establish guilt beyond a reasonable doubt, the conviction will be reversed. (*People* v. *Kazmierczyk*, 357 Ill. 592; *People* v. *Jung*, 358 id. 488; *People* v. *Gold*, 361 id. 23; *People* v. *Schiro*, 361 id. 117.) The evidence in this case is not of that clear and convincing character that is required to establish guilt beyond a reasonable doubt.

The proof tended to show that Silverstein was a large, robust man; that he had a feeling of ill-will and animosity toward defendant, and that he availed himself of numerous opportunities to bully, beat and mistreat him. It was proper to show that Silverstein's persistent course of rough

and brutal conduct had engendered in defendant a physical fear for his own safety, but complaint is made that the trial court unduly limited the cross-examination of People's witnesses, and the direct examination of the defendant's witnesses, upon this point. Defendant was not even permitted to testify, with any degree of definiteness, to his own physical condition about the time of the altercation. He made an offer to show that in the summer of 1930 he had undergone a chest operation; that he had been advised by his physician that he had a bad heart, and that he could not engage in strenuous physical effort. The court erroneously refused to permit defendant to make such proof. Wharton on Criminal Evidence, 11th ed. sec. 328.

Defendant's flight was a circumstance tending to prove his guilt and could be shown by the People. On the other hand, if there were circumstances which would tend to explain or excuse the flight, defendant had the right to show them. Flight from the scene of a tragedy may be as consistent with innocence as with guilt. It is not always dictated by impulse or purpose to escape the consequences of acts done or charges that may be made. If the flight is unexplained, it may permit an inference of guilt, but it has no such significance when the conduct of the accused is equally, or more, consistent with some other hypothesis. (*People* v. *Stillwell,* 244 N. Y. 196.) Defendant was not permitted to tell what motivated his flight although an offer was made to do so.

Defendant complains of the giving of two instructions on the ground that there was no basis in the evidence to warrant them. We have examined the instructions and are convinced that they are not subject to the criticism made against them.

On account of the errors pointed out we think defendant should be accorded another trial. The judgment is reversed and the cause is remanded to the criminal court of Cook county for a new trial. *Reversed and remanded.*