People of the State of Illinois, Plaintiff-Appellee, v. Vincent Colletti and Smile Guajardo, Defendants-Appellees.

Gen. No. 68–26.

Second District.

November 8, 1968.

Rehearing denied December 10, 1968.

Julius Lucius Echeles and Jo Anne F. Wolfson, of Chicago, for appellants.

William V. Hopf, State's Attorney of DuPage County, of Wheaton, and Kevin P. Connelly, Assistant State's Attorney, for appellee.

MR. JUSTICE MORAN delivered the opinion of the court.

The defendants were convicted on both counts of an indictment charging them with the robbery of Nora Birdsong, and with the crime of burglary, in that they entered her home with intent to commit a felony. The case was

tried to a jury. Colletti was sentenced to a term of 6 to 15 years, and Guajardo to a term of 9 to 18 years. The appeal was transferred here by our Supreme Court on the ground that no substantial constitutional question is involved.

Upon appeal, the defendant Colletti only contends that the court erred in refusing him a severance, and we will discuss the evidence to the extent necessary to dispose of that point.

Mrs. Nora Birdsong, who resided alone in Woodridge, was employed as a waitress and, on the night of May 24, 1966, earned about $27 in tips. When she returned home that night, she placed this money on her kitchen table. According to her testimony, it consisted of about $6 or $8 in quarters, a few nickels and dimes, and the rest was in bills.

She awoke at about 9:00 a. m. the next morning and started to make a pot of coffee. She heard her rear doorbell ring, and then a man entered the rear door, brandishing a pistol. The man tied her up and took her to the bedroom, where he pushed her onto the bed and told her to keep quiet. After that, she heard noises all over the house, like the sound of drawers slamming, and she also heard mumbling. She was unable to tell how many voices there were. She began to moan, and she heard a voice say, "Go in there and shut her up . . . ," whereupon a man appeared at the bedroom door. This was not the same man she had seen earlier.

When she was alone again, Mrs. Birdsong managed to free her hands and called the telephone operator and reported that a robbery was in progress. The operator then relayed the information to the police, and two squad cars arrived on the scene within a few minutes. One car was driven by Joel Kagann, the Chief of Police of Woodridge and the other was driven by Officer George Zima of the Woodridge Police Department. Chief Kagann entered the front door of the house, while Officer Zima went around

to the rear. Kagann found clothing and other items strewn about the floor of the house, and observed the defendant Guajardo standing near the television set with something in his hand. Guajardo dropped what he had in his hand and started moving toward the television set. There was a gun on top of the television set. Kagann said, "Freeze, Police Officer," whereupon Guajardo stood still. As Chief Kagann entered the house he heard Officer Zima yell, "Hold it, Police Officer." Zima later appeared with the defendant Colletti in custody. Zima testified that, when he rounded the house, he saw the defendant Colletti running from the direction of the back door. When Colletti was searched, the pocket of his sweater was found to contain $27.60, consisting of $6.25 in quarters, a few nickels and dimes, and the remainder in bills. He also had $120 in his wallet and $4.50 in his right pants pocket.

Mrs. Birdsong was unable to identify either of the defendants. Mrs. Irene Erickson, who lived about a block away from the Birdsong house, testified that, at the time the two police cars pulled up to the house, she saw a man running out the back door of the Birdsong house. She said that she had this man in sight until he was apprehended by the policeman who went around to the back of the house. Her testimony was corroborated by Mrs. Elizabeth Dickson, who was visiting Mrs. Erickson at the time. The only important difference in their testimony is that Mrs. Dickson said the man was blocked from their sight for a few moments between the time he came out the back door and the time he was apprehended by the police officer.

Neither of the defendants testified.

With this factual background, we come to the first assignment of error, which is the defendant Colletti's contention that his pretrial motion for severance should have been granted. The motion was made at the time the case was called for trial, at which time counsel for

Colletti informed the court that the defendant Guajardo had made "exculpatory statements" to the police at the time of his arrest, which statements would not be admissible against Colletti, and that therefore a severance should be granted. The court denied the motion.

At the trial, it was not the State which introduced the evidence of Guajardo's statement. Rather, it was counsel for Guajardo who, on cross-examination of Chief Kagann, elicited, over the objection of Colletti, the information that, after his arrest, when asked what he had been doing in the Birdsong home, Guajardo stated that he had been walking along the street and saw a man run out of the back door of the house, whereupon he "went into the house to see what was wrong."

Colletti correctly points out that this evidence was improperly admitted. The statements made by a party are frequently admitted in evidence when offered by his opponent, because the hearsay rule does not apply in that instance. However, the hearsay rule does preclude a party from proving his own self-serving statements. It is not claimed that the statement was made as part of the res gestae. Statements made out of court by a party opponent, when offered against him are admissible as an admission; however, when offered in his favor they are not admissions and become grounds for objection under the hearsay rule. (4 Wigmore on Evidence, § 1048, pp 2–4 (3rd ed 1940).) See also People v. Kosearas, 410 Ill 456, 459, 102 NE2d 534 (1951); People v. Jones, 26 Ill2d 300, 305, 186 NE2d 314 (1962). Thus, even if Guajardo had been on trial alone, he would not have been entitled to introduce this testimony.

Here, we would be particularly disposed to reverse the conviction of Colletti if we felt that he had been prejudiced by the hearsay testimony. However, we agree with the State that Colletti was not prejudiced by it. The exculpatory statement of Guajardo did not, in our opinion, incriminate Colletti. If it had, we would reverse

Colletti's conviction—not because his motion for a severance was denied, but because the evidence was improperly admitted over his objection. However, we fail to see how Colletti could have been prejudiced by the statement of Guajardo that he had entered the house because he had seen a man running from the rear door, when the uncontradicted evidence indicates that Guajardo was already in the house before Colletti ran out. If the jury had given any weight to the hearsay statement attributed to Guajardo, they might have concluded that there was a third person involved, but we do not see how they could have concluded that Colletti was the person referred to by Guajardo. On this appeal, Colletti does not specify the manner in which he feels he was prejudiced by the hearsay testimony. His only argument on the point is that "by the impermissible testimony of Colletti's co-defendant, the State's witnesses were, in a manner, corroborated." We do not see how Guajardo's statement does in fact corroborate the State's witnesses, and, since Colletti has given no other indication as to how he might have been prejudiced by the improper testimony, we hold that its admission did not constitute reversible error.

It is argued that the recent decisions of Bruton v. United States, 352 US 232, 88 S Ct 1620, 1628 (1968) and People v. Miller, 40 Ill2d 154, 158–159, 238 NE2d 407 (1968) should be sole authority for the reversal of Colletti's conviction. We are of the opinion that both of these cases are distinguishable on their facts from the case at bar. In both the Bruton case and the Miller case the testimony was elicited by the State on examination and directly named the codefendant. In the case at bar, the alleged erroneous testimony was elicited by Guajardo's counsel and did not name Colletti as the man running from the rear door. As already stated, "a man" referred to by Guajardo in his statement could not be Colletti.

The remaining assignment of error is urged by both defendants. They moved, prior to trial, for the production of transcripts of the witnesses who testified before the Grand Jury which indicted them. The State's Attorney stated that no court reporter had been present at the Grand Jury proceeding, and that no other kind of recording device had been used, so that there was no record of the testimony given before the Grand Jury. The defendants then requested the court to hold a hearing, at which they would have the opportunity to prove that the State's Attorney of DuPage County made it a practice not to have court reporters present at Grand Jury proceedings, and that the sole reason for this practice was to deprive defendants of an opportunity to have access to Grand Jury testimony for impeachment purposes. The defendants also moved to dismiss the indictment on the ground that they had been deprived of an opportunity to know what had been said before the Grand Jury. The court denied both motions.

On this appeal, defendants take the position that the policy of the State's Attorney, which they offered to prove, constitutes a denial of their Constitutional right to due process of law.

The State does not contest the sufficiency of defendants' offer of proof, so we are not called upon to decide whether the record is sufficient in this regard. In any case, we prefer to pass upon the merits of defendants' contention, based upon the assumption that there may indeed be a policy of the State's Attorney to dispense with court reporters before the Grand Jury, and that his purpose in doing so may indeed be to avoid the necessity of producing transcripts of Grand Jury testimony for impeachment purposes at the trial. We also lay to one side the question of whether the pretrial motion was premature, People v. French, 61 Ill App2d 439, 446, 209 NE2d 505 (1965), because the defendants also moved for

production of the witnesses' Grand Jury testimony after the witnesses testified during the trial, and moved for a directed verdict of acquittal based upon the inability of the State to produce it.

█ The basic question is whether the State has a duty to insure that the testimony of witnesses before the Grand Jury will be recorded for the later use of the defendant. It is clear that no such duty exists. People v. Aughinbaugh, 36 Ill2d 320, 324–325, 223 NE2d 117 (1967). Accordingly, it makes no difference what the motive of the State's Attorney was in not having the testimony recorded.

█ The theory advanced by the defendants would create impossible problems of administration, and we think it is worthwhile to point out a few that occur to us. Every time the State called a witness whose Grand Jury testimony had not been recorded, an inquiry would have to be held as to the "motive" of the prosecutor in not having had a reporter present. Then, assuming that the prosecution did have transcripts of the testimony of all witnesses who did appear before the Grand jury, we suppose the next inquiry would be why some witnesses appearing at the trial did *not* testify before the Grand Jury. Was it because the State did not want their testimony recorded? The field of inquiry suggested by the defendants would go, of course, beyond the matter of Grand Jury testimony. The rule that a defendant is entitled to Grand Jury testimony if it is available (People v. Johnson, 31 Ill2d 602, 606, 203 NE2d 399 (1964)) is, after all, simply an extension of the rule that statements of witnesses in the possession of the prosecution must be turned over to the defendants for impeachment purposes. People v. Moses, 11 Ill2d 84, 89, 142 NE2d 1 (1957); People v. Wolff, 19 Ill2d 318, 327, 167 NE2d 197 (1960). If we were to adopt the position urged by the defendants in connection with Grand Jury testimony, it would necessarily follow that the "motive" of every policeman

58

in failing to take a written statement of a prospective prosecution witness would be a legitimate subject of inquiry when the witness later testified.

We will not pursue this train of thought any further, because it must inevitably lead to a Kafka-like dream in which police departments and prosecutors' offices become mere clerical centers for the recording and transcription of witnesses' statements to be turned over to the defense. The Moses-Wolff rule stops somewhere, and it stops considerably short of that.

The judgment of the lower court is affirmed.

Judgment affirmed.

DAVIS and SEIDENFELD, JJ., concur.