THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DARRELL PEATRY, Defendant-Appellant.

Second District (1st Division)   No. 74-308

Opinion filed May 12, 1976.

Ralph Ruebner and J. Daniel Stewart, both of State Appellate Defender's Office, of Elgin, for appellant.

Jack Hoogasian, State's Attorney, of Waukegan (Edward N. Morris and Christine Drucker, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE SEIDENFELD delivered the opinion of the court:

Darrell Peatry was convicted of murder, attempt murder and armed robbery and sentenced to 40 to 120 years' imprisonment for each offense, the sentences to be served concurrently. He appeals, contending that (1) he was deprived of a fair trial because the court refused to order the disclosure of the identity of an informer to aid him in his defense; (2) the instructions erroneously permitted the jury to find him guilty of attempt murder without the requisite specific intent; and (3) the court erred in imposing two additional concurrent sentences after the notice of appeal had been filed.

The defendant and five other persons who are not parties to this appeal[1] were jointly indicted for the murder and armed robbery of William Richter and the attempted murder of James Davis. The crimes were committed shortly before 3 a.m. on September 2, 1972, while the victims' vehicles were parked on the shoulders of the Edens Expressway in Lake County.

William Jackson, who had not been indicted at the time of the trial, testified for the State. He was present when several persons, including the six eventually indicted, discussed getting money by robbing truck drivers

---

[1] Charges against Edward Moran and Nathaniel Burse were dismissed after their deaths in the county jail. Michael Clark, Donald Taylor and Robert Wilson were tried separately.

parked on the shoulders of expressways in the Chicago area. As a result of these discussions he assisted some of the men in obtaining arms and automobiles. After the discussions and preparations, Jackson and six others drove north on Edens Highway to a point where a Mustang, a semitrailer truck, and a pickup were parked on the shoulder of the expressway. The murder victim, Richter, was in the pickup truck and Davis was in the "semi." Jackson was in a car with three others, one of whom was armed with a .38-caliber weapon. The defendant allegedly was in another car with two others. Jackson testified that the car the defendant was in was behind the car that he was in. According to the witness both cars were parked behind the Mustang and in front of the "semi." The pickup was behind the "semi."

Jackson testified that he approached the Mustang while the others went back toward the trucks. After determining that the Mustang was locked, Jackson returned to the car in which he had been riding and sat down. While returning to the car, he noticed three men near the semitrailer truck but recognized only one of them, not the defendant. He looked back at the trucks twice but apparently could not see what was happening. He heard several shots on two occasions, saw the "semi" pull out and pass the car he was in, saw two of the men he had been traveling with come back to the car he was in, saw the third man he had been traveling with looking around in the grass near the "semi" for a magazine, and then drove the car out of the area.

Jackson was a member of the De Mau Maus. He testified that he had told the police of his involvement with a murder committed by members of the De Mau Maus in which the victim had been a man from Carbondale who was murdered on Interstate 57. Jackson said that he had named the others involved in that crime including Garland Jackson and had testified for the State during the trial in Franklin County. He also testified that he had named the De Mau Maus who were involved in the murder of a family in Barrington Hills. The witness stated that Garland Jackson had not been involved in the Barrington Hills murder or the offenses committed on September 2 although Garland had been present on September 1 when the idea of robbing truck drivers was discussed.

James Davis who was in the semitrailer truck testified that he had been awakened by a man asking for assistance with a flat tire. While conversing with this man, he looked into the rear view mirror and noticed another man with a gun. He started the engine and drove away but shots were fired at his truck. He could not positively identify any of the assailants. Richter, the murder victim, lived for about two weeks following the shooting but also was unable to identify his assailants. There was evidence that the bullets removed from Richter's body and from the trucks came from two different .38-caliber weapons.

Defendant did not testify.

The defense attempted to establish that the crimes committed on September 2, 1972, were De Mau Mau operations, that the leaders of the organization were the two Jacksons, that Peatry was not a member and was not present at the time of the crimes, but that Garland Jackson was present, and presumably was being shielded by his close friend, William Jackson.

William Jackson, however, testified that Peatry was a member of the De Mau Maus. The witness denied being a leader of the group and denied that the purpose of the group was to commit crimes against and kill whites in the suburbs rather than blacks in the inner city.

There was evidence that: (1) Garland Jackson and William Jackson had been very close friends for about ten years. (2) William Jackson would do almost anything for Garland Jackson. (3) Law enforcement officers working on the Carbondale killing told William Jackson that they knew Garland Jackson was involved before he confirmed Garland's involvement. (4) At the trial in Franklin County William Jackson minimized Garland Jackson's involvement and indicated that he knew nothing about plans to steal the Carbondale victim's car and to kill him before these events in fact occurred. (5) Garland Jackson was a member of the De Mau Maus. (6) The Cook County Sheriff's Department had developed a confidential informant (called Number 72—51) who had infiltrated the De Mau Maus. (7) The informant had told officers of the Cook County Sheriff's Department that the purpose of the group was to commit crimes against whites in suburbs instead of crimes against blacks in the city and that William Jackson and Garland Jackson appeared to be informal leaders of the De Mau Maus. (8) The informant had never said that Peatry was a member of the De Mau Maus. (9) The informant had not supplied law enforcement officers with a complete list of all members of the De Mau Maus, and (10) The informant had never mentioned Peatry.

Defendant made several attempts both prior to and during trial to require disclosure by the State of the informant. He contends that the court committed prejudicial error in refusing to order disclosure. He argues that William Jackson was the only witness who placed him at the scene of the crimes and that the informant could aid in impeaching Jackson's testimony, particularly the testimony that defendant was a member of the De Mau Maus and that the witness was not a leader of the group. He also sought to establish that the crimes committed on September 2 were part of the continuing plan and pattern of crimes committed by the De Mau Mau organization.

The court denied disclosure of the informant on the basis that there was no clear indication that the informant was familiar with the entire

membership of the De Mau Maus or would testify that Peatry was definitely not a member. Defendant reasons that the desirability of calling the witness was a matter for the accused rather than the State to decide and that the defendant was deprived of due process by the court's action. He also contends that evidence potentially favorable to the accused was erroneously suppressed.

The State responds that even if the informant could contradict Jackson's testimony about his leadership role in the De Mau Maus and the purpose of the group and further even if he had been able to state that Peatry was not a De Mau Mau, the testimony would not tend to prove that Jackson was lying about Peatry's presence or that Peatry was in fact not present. Further, the State reasons that the evidence demonstrated that the informer never discovered whether Peatry was a member of the De Mau Maus and never purported to know the names of the entire membership. Therefore it concludes that the informant's testimony would not have been relevant to prove that the defendant was not a member of the De Mau Maus. The State argues that the impeachment of Jackson's statement about his leadership role and the purpose of the group would have been inconsequential considering the cross-examination of Jackson which demonstrated that he was a moving force in the De Mau Maus and that the group had participated in the killings of several white persons outside the inner city area.

■■ The right of a defendant to require disclosure of an informant is defined in *Roviaro v. United States*, 353 U.S. 53, 62, 1 L. Ed. 2d 639, 646, 77 S. Ct. 623, 628-29 (1957), as follows:

"We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors."

See also *People v. Lewis*, 57 Ill. 2d 232, 235 (1974).

Defendant places reliance on *Roviaro v. United States, People v. Lewis,* and *People v. Chaney,* 27 Ill. App. 3d 366 (1975), *aff'd* in 63 Ill. 2d 216 (1976).

While it is true that in each of the cited cases disclosure was required, the facts were substantially different than those before us. In *Roviaro* and *Lewis,* the undisclosed informer was the only other participant with the accused in the transaction charged and was in a position to give highly relevant testimony which could have been helpful to the defense. In

*Chaney,* unknown to the defendant, the informer was one to whom the defendant had confided his burglary plans and in fact had accompanied the defendant to the place intended to be burglarized which he knew would be under police surveillance. The defendant called the informant as his witness in order to establish a defense. The officers who had testified for the State had been asked to disclose the identity of the informer and were holding a statement made by him soon after the crime which enabled the prosecutor to destroy the informer as a defense witness. The appellate court under these circumstances held that the withholding of the identity of the witness as the State's informer deprived defendant of a fair trial and was prejudicial error, and the majority of the Supreme Court agreed.

When we apply the balancing tests set forth in *Roviaro* to the facts in this case we must conclude that the trial court acted properly in refusing to order disclosure of the informant. The informant did not infiltrate the De Mau Mau organization until after the commission of the crimes with which defendant was charged. The court permitted extensive inquiry outside the presence of the jury into the extent of the possible testimony of the informant. Clarence Buchendahl who had been assigned to investigate homicides thought to be linked to the De Mau Mau organization told of developing a relationship with the confidential informant whom he referred to as "72—51." Buchendahl testified that "72—51" gave him "some of the names" of the members of the De Mau Maus and that defendant's name had never been mentioned by the informant. There was no showing that "72—51" knew the entire membership of the organization. The court correctly concluded that the informer's testimony would not tend to prove that defendant was not a member of the De Mau Maus. There is no showing that the informant had any information about the crimes charged against the defendant, nor was there any evidence that the informant could impeach Jackson's testimony that defendant was involved in the September 2 crimes on Edens Highway. The possibility of the informant being able to impeach Jackson on collateral matters, whether the witness was a leader of the De Mau Maus as he stated or as to the purposes of the organization, would not be of sufficient relevancy and weight in the balancing process to tip the scales in favor of disclosure. The obvious danger to the informant and the prejudice to the flow of information to law enforcers were of greater weight. The discretion of the court was therefore properly exercised. *Cf. People v. Williams,* 38 Ill. 2d 150, 153-54 (1967).

Defendant also contends that the instructions erroneously permitted the jury to find defendant guilty of the attempted murder of Davis without a finding of specific intent. The instructions included the following:

People's Instruction No. 9, IPI—Criminal No. 6.05:

"A person commits the crime of attempt who, with intent to

commit the crime of Murder, does any act which constitutes a substantial step toward the commission of the crime of Murder. The crime attempted need not have been committed."

People's Instruction No. 10, IPI—Criminal No. 6.07:

"To sustain the charge of attempt, the State must prove the following propositions:

First: That the defendant performed an act which constituted a substantial step toward the commission of the crime of Murder; and

Second: That the defendant did so with intent to commit the crime of Murder.

If you find from your consideration of all the evidence that each of these propositions has been proved beyond a reasonable doubt, then you should find the defendant guilty.

If, on the other hand, you find from your consideration of all the evidence that any of these propositions has not been proved beyond a reasonable doubt, then you should find the defendant not guilty."

People's Instruction No. 12, IPI—Criminal No. 7.02:

"To sustain the charge of murder, the State must prove the following propositions:

First: That the defendant performed the acts which caused the death of William Richter;

Second: That when the defendant did so, he intended to kill or do great bodily harm to William Richter, or

he knew that his act would cause death or great bodily harm to William Richter, or

he knew that his acts created a strong probability of death or great bodily harm to William Richter, or

*he was attempting to commit or was committing the crime of Armed Robbery.* * * * " (Emphasis added.)

Defendant argues that Instruction No. 12, which stated the alternative proof necessary to sustain the charge of murder in the terms "he was attempting to commit or was committing the crime of Armed Robbery," when read in conjunction with Instructions 9 and 10 defining attempt, permitted the jury to convict the defendant of attempted murder if they found that he or his accomplices committed an armed robbery during which someone died.

The Supreme Court recently considered a somewhat similar contention in *People v. Viser*, 62 Ill. 2d 568 (1975).

In *Viser*, the defendants were charged with the attempt murder of one Harold Smith. The jury was instructed in language essentially similar to

Instruction 12 here (IPI—Criminal 7.02) that a person commits the crime of murder, who, in the alternative, is attempting to commit or is committing the crime of aggravated battery. The Supreme Court held that the instruction was fatally defective because it permitted the jury to find defendant guilty of attempting to murder Harold Smith if they believed the defendants were committing the forcible felony, that is, aggravated battery. The court pointed out that the unique characteristic of felony murder is that it does not include an intent to take life and that it was therefore error to instruct the jury that the defendants could be found guilty of attempted murder in the absence of such an intent.

■■ Here, however, the jury was not instructed that defendant was guilty of attempt murder if they believed he was committing or attempting to commit the armed robbery of Davis. The murder instruction, which included the felony-murder language, was given in regard to the murder of Richter and mentioned the victim's name four times. In both the definitional instruction (No. 9) and the issue instruction (No. 10) on attempt murder, "intent to commit murder" was explicitly stated to be an element of the offense. Under these circumstances we do not believe the jury was misled. *Cf. People v. Gersbacher,* 44 Ill. 2d 321, 325-26 (1970).

Defendant's final claim of error concerns the amendment of the judgment and mittimus by the trial court after the filing of the notice of appeal. On February 7, 1974, the defendant, and Michael Clark, who was separately tried, appeared before the sentencing judge. At the conclusion of the hearing the Judge stated:

> " * * * it is the judgment of this Court that each of you for the crimes for which you have been found guilty will be sentenced to the Department of Corrections for a term of not less than 40 nor more than 120 years * * *."

The written judgment order and the mittimus filed on February 7 recited that the defendant Peatry was guilty of the crimes of murder, attempt to commit murder and armed robbery. The term of imprisonment was fixed at "Minimum Forty (40) years—Maximum One Hundred Twenty (120) years." The notice of appeal was also filed on February 7. From the recitals in the common law record it appears that on February 25, 1974, the judgment and mittimus were amended to recite "Minimum Forty (40) years—Maximum One Hundred Twenty (120) Years each as to charge of Murder, Attempt to Commit Murder, Armed Robbery—Sentences to be served concurrently." The record does not disclose that any notice was given of the amendment or that either defendant or his counsel were present on the February 25 date.

Defendant argues on this record that the trial court imposed additional concurrent sentences after the filing of the notice of appeal had deprived it of jurisdiction to impose additional sentences.

■■ We agree generally with defendant's claim that after the notice of appeal is filed the trial court does not retain jurisdiction to modify the judgment. (See *People v. Glenn*, 25 Ill. 2d 82, 85 (1962). See also *People v. Green*, 34 Ill. App. 3d 153, 156 (1975); *People v. Kleba*, 1 Ill. App. 3d 563, 565 (1971).) The fact that an appeal has been taken, however, does not deprive a trial court of jurisdiction over its record or of the power to correct it. *(People v. Glenn*, 25 Ill. 2d 82, 85 (1972).) It has also been held that the defendant is not entitled to counsel at proceedings to correct the record. *People v. Ferguson*, 410 Ill. 87, 90 (1951). See also *People v. Michael*, 23 Ill. 2d 338, 340 (1961).

■■ On the record before us we conclude the court obviously did not intend to negate convictions of separate offenses arising from different acts based on jury verdicts or to enter incomplete judgments. (See *People v. Gregory*, 77 Ill. App. 2d 188, 193 (1966). *Cf. People v. Wilson*, 37 Ill. App. 3d 560 (1976).) Therefore, the court could correct the record to make it comport with the apparent intention to impose sentences on each of the separate convictions.

For the reasons stated the judgment as corrected on February 25, 1974, is affirmed.

Affirmed.

GUILD, P. J., and HALLETT, J., concur.