THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JASPER JOHNSON, Defendant-Appellant.

First District (2nd Division)   No. 61900

Opinion filed September 14, 1976.

James R. Streicker and Victoria J. Meyers, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Iris E. Sholder, and Renee G. Goldfarb, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DOWNING delivered the opinion of the court:

Jasper Johnson (defendant) was tried by a jury, found guilty of murder (Ill. Rev. Stat. 1971, ch. 38, par. 9—1) and sentenced to a term of 15-45 years.[1]

The issues on appeal are: (1) did the trial court err in allowing an amendment of the record on appeal; (2) did the trial court improperly exclude certain evidence; (3) did the second playing of a tape recording of defendant's telephone conversation with the police prejudice defendant; (4) did the prosecutor's closing argument improperly refer to evidence outside the record; (5) did the trial court err in refusing to give a separate instruction on the defense of accident; and (6) was defendant proved guilty beyond a reasonable doubt.

---

[1] The record, as discussed in section VII of this opinion conflicts as to whether defendant was sentenced to 15-25 years or 15-45 years.

On February 12, 1972, the dead body of Dovie Tillman was found in defendant's basement apartment at 9206 South Racine, Chicago, Illinois. It appeared the deceased died as a result of a bullet wound in the head. The police went to this apartment in response to a telephone call from defendant, who, calling from Helena, Arkansas, told the police he shot decedent and her body was in his apartment. After making this call, defendant returned to Chicago, Illinois, and voluntarily surrendered himself to the police. The evidence presented at that trial was as follows.

Nellie Tillman, decedent's mother, testified that she had last seen her daughter on February 10, 1972, when she left home to attend school, and next saw her at the County Morgue on February 12, 1972; that decedent and defendant had been going together for about three years at the time of Dovie's death, but that Dovie had been trying to break up with defendant since the beginning of 1972. While Nellie admitted she had never seen defendant physically abuse her daughter, she testified that in December of 1971, she noticed bruise marks on Dovie's neck, that the defendant had admitted to Nellie that he had choked Dovie, but said he would not do that again. Nellie also testified that on February 9, 1972, she overheard a telephone conversation between defendant and the deceased in which defendant threatened to get even with decedent if it was the last thing he did.

Two of decedent's brothers testified. Neither of them ever recalled seeing defendant physically abuse his sister. Matthew Tillman, decedent's brother, testified that in December 1971, he picked his sister up at a drugstore; and that she was crying and had marks on her neck. He noticed when he pulled away from the drugstore that defendant was following them in his car. The last time Matthew saw his sister alive was in front of their home in defendant's car at about 9 p.m. on February 10, 1972. David Tillman, a brother, testified that some time around Christmas 1971, he had seen defendant about 10 p.m. in front of the Tillman home with a gun; that he saw his sister, decedent, drive up to the house with a friend, and when she looked out of the car and saw defendant standing in front of the house, the car pulled away; and that shortly thereafter his sister came in the back door of the house.

Eugene McShane, a Chicago Police officer, testified he was on telephone duty between 7:30 and 7:45 a.m. on February 12, 1972, when a telephone call was received from defendant. A tape recording of the telephone conversation with defendant was introduced at trial and played before the jury. In that tape, defendant admitted shooting decedent and informed the police that her body would be found in his apartment. Because portions of the tape were unclear, the tape was played a second time over defendant's objection.

Ted Clemons, defendant's landlord, testified he received a telephone

call from defendant at about 7:30 a.m. on February 12, 1972. In that call defendant asked Clemons for advice because he was in trouble. Defendant told Clemons he had shot a girl and did away with her body because he thought she was dead. Defendant told Clemons he was then in Arkansas and had done away with the gun so no one would find it. Clemons testified he told defendant to come back home and give himself up. After this conversation with defendant, the police arrived at Clemons' home and stated they were looking for a body in the basement. Clemons said he did not call the police, but took them to the basement as they asked him to do. Clemons unlocked the door to defendant's basement, one-room apartment and watched the police uncover the body of the deceased which was under a blanket on the bed in the room. About 4 o'clock that afternoon Clemons called defendant's mother, and she and two of her sons arrived about 8 p.m. to remove defendant's belongings from the room.

Both Clemons and the investigating officers testified to the condition of defendant's room and the decedent's body upon their entry. The room was disheveled and deceased's body was under a blanket on the bed, naked from the chest down, with a bullet wound in her head. A black fur coat was found on a chair in the corner of the room. There was blood on the door to defendant's room.

Investigator Patrick O'Hara of the Chicago Police Department testified concerning the scene of the crime, as well as a description of defendant's car which was discovered at the police auto pound. The car was found at the pound on February 14, 1972. O'Hara inspected the vehicle which had been towed to the pound from 167 North Clark—near the Greyhound Bus Station. He found blood on the front seat and door frame of the car. Books and a purse, which were identified by Nellie Tillman as belonging to the decedent, were found in the front of the car. O'Hara testified that he could not recall finding any letter in the glove compartment of that car.

The pathologist testified that decedent died from a bullet which entered her left temple from a distance of two to three feet and traveled to the right parietal temple where it lodged. The stomach content of the body was not alcoholic. Decedent's blood type was "O"—the same as that found on the seat of defendant's car.

Defendant's motion for a directed verdict was denied. Thereupon defendant testified he picked decedent up after school at about 8:15 p.m. on February 10, 1972, at the "L" station at 63rd and Halsted. He believed decedent may have been drinking prior to this time. They stopped and bought some food from a neighborhood Burger King and drove to decedent's home, 6811 South Emerald. The couple sat in defendant's car in front of decedent's home and had a conversation about a letter which defendant had written to decedent which was in the glove compartment.

Dovie opened the glove compartment to take out the letter, but removed a gun, which defendant kept in that compartment, and pointed it at defendant. The couple struggled, decedent held the gun in her right hand and pointed it at defendant, defendant grabbed her right wrist with his left hand, and as defendant tried to take the gun away from the decedent, she was shot. Defendant denied pulling the trigger. He removed the gun from decedent's hand after the accident, put it in a brown bag, and drove to his apartment, 9206 South Racine—about 20 blocks away. He carried decedent's body into his one-room basement apartment and put her on the bed and covered her with a blanket. Defendant testified that decedent was still wearing her black fur coat when he covered her with the blanket. He left the gun in a paper bag on the television set and went to his mother's home at 106th and Wentworth. He did not remember if he locked the door to his room when he left. When he arrived at his mother's, he felt ill, took some pills, and later was taken by his mother to the hospital. He was treated in the emergency room and returned to his mother's. Defendant then left his mother's and went to the Chicago Greyhound Bus Station and left for Little Rock, Arkansas. Defendant attempted to explain that he had gone to Little Rock to see Reverend Angelo Johnson with whom defendant had worked as a missionary. The trial court sustained the State's objection to this evidence, whereupon the defendant made an offer of proof regarding the alleged conversation between Dovie and the defendant immediately prior to her removing the gun from the glove compartment. The offer of proof was denied. When defendant could not find Angelo Johnson in Little Rock, he called the police in Chicago on February 12, 1972, and told them about the body in the basement at 9206 South Racine. Defendant returned to Chicago a few days later, appeared at the police station with his attorney, and surrendered himself.

Mary Lee Johnson, defendant's mother, testified at trial, corroborating defendant's version of the events of the evening of February 10, 1972, when he arrived at her home. She also described the condition of defendant's room as she found it on February 12, 1972. She noted there was no television in the room, as appeared in the State's exhibits showing the condition of the room at the time the body was discovered, and there was no brown bag with a gun on top of that television as described by defendant.

Four persons testified as character witnesses that defendant was a peaceful and law-abiding person.

## I.

First we consider defendant's contention that the trial court improperly amended the record on appeal. The original transcript of the proceedings, certified by the court reporter and filed with this court,

recorded the taped telephone conversation between Officer McShane and defendant in part as follows:

Defendant: "I was playing around with her—

\* \* \*

I was playing with (unintelligible)."

The State moved before the trial court to correct the above portion of the transcript to read:

Defendant: "I was playing with a gun and I shot her in the head.

\* \* \*

I was playing with a gun and I shot her."

The only support the State submitted in support of its motion was an affidavit of the prosecutor as to his recollection of what the tape said, and a statement made by the prosecutor during closing argument claiming defendant admitted shooting decedent in his conversation with the police. The prosecutor quoted the tape as reporting defendant said: "I was playing with a gun and I shot her."[2] Defendant did not object to this statement made during closing argument. The trial court then allowed the amendment of the record on appeal and a supplemental record was filed with this court.

■■ Supreme Court Rule 329 (Ill. Rev. Stat. 1973, ch. 110A, par. 329) allows the amendment of a record where there is a material omission, inaccuracy, or improper authentication so that the record conforms to the truth. Our supreme court has held that in order to prove there has been such an omission or inaccuracy, the moving party must submit some note or memorandum from the records or quasi-records of the court to support the amendment. (*People v. Miller* (1936), 365 Ill. 56, 58-59, 5 N.E.2d 458.) The fact that an appeal has been taken does not deprive a trial court of the power to correct its record. (*People v. Peatry* (2nd Dist. 1976), 38 Ill. App. 3d 332, 340, 347 N.E.2d 169.) This court has recently set forth what is necessary to amend a record after trial. In *Hartgraves v. Don Cartage Co.* (1st Dist. 1975), 27 Ill. App. 3d 298, 301, 326 N.E.2d 461, *aff'd*, 63 Ill. 2d 425, 328 N.E.2d 457, this court said:

"The law in Illinois is clear that a correction of the record cannot be made from either the recollection of the judge or from an affidavit. [Citations.] The rule was set forth most recently by this court in *In re Application of County Collector* (1974), 18 Ill. App. 3d 272, 277, 309 N.E.2d 722, wherein we wrote:

' \* \* \* to amend a record after trial or hearing more than oral testimony or proof of mistake is necessary. The proof must be underlined by the production of some note or memorandum either from the records of the court, or by the

---

[2] The tape in question was impounded, after trial, by the trial court. Thereafter it could never be located.

minutes of the judge, or by the documents on file in the cause, not by the memory of witnesses, the recollection of the judge, or by supporting affidavits.' "

In our opinion the affidavit of the prosecutor presented in support of the State's motion is not sufficient.

Neither do we find that a failure to object to a statement made in closing argument is sufficient to support an amendment of a record. Closing argument is not evidence. There may be several reasons for failing to object to an argument made by the opposing party—trial strategy, inadvertence, uncertainty. We are in no position to presume the basis for the failure to object. In any respect, such a negative presumption would not meet the affirmative test required to correct a record.

■■ We consider the trial court erred in allowing the amendment to the trial record. Consequently, we will disregard for purposes of this appeal the amendment to the record and will only consider the record as originally submitted to this court by the court reporter.

## II.

The evidentiary errors urged by defendant are: (a) the trial court improperly excluded evidence of an argument between defendant and decedent immediately prior to her death; (b) the trial court improperly excluded evidence of defendant's reasons for going to Little Rock, Arkansas immediately after the shooting; and (c) the trial court improperly limited defendant's cross-examination of Nellie Tillman, mother of the deceased.

## A.

Defendant contends the trial court committed reversible error by refusing to allow defendant to testify that immediately prior to decedent's pulling a gun on him, they had been quarreling, and he had informed decedent he was breaking up with her. Defendant's offer of proof, denied by the trial court, alleged that there was a conversation constituting a quarrel which resulted in the decedent reaching in the glove compartment and securing the gun. The State argues this testimony was properly excluded because it was irrelevant and legally incompetent.

However, as pointed out by defendant, the testimony was relevant because it supported his theory of the case. In a murder trial, an alleged argument between the defendant and decedent prior to the shooting could well have supported defendant's defense, giving decedent a reason for pulling a gun on him. A defendant is entitled to all reasonable opportunities to present evidence which might tend to creat a doubt as to his guilt. *People v. Bergeron* (1st Dist. 1973), 10 Ill. App. 3d 762, 769, 295 N.E.2d 228.

In *Wohlford v. People* (1894), 148 Ill. 296, 36 N.E. 107, our supreme court reviewed the right of a defendant when testifying to relate his intent, for example, where the charge is murder and the plea is self-defense. What credit should be given to such evidence is a matter for the trier of fact in connection with the other facts and circumstances in the record. (See also *People v. Peters* (1914), 265 Ill. 122, 130, 106 N.E. 513.)[3] Defendant was charged with murder (Ill. Rev. Stat. 1971, ch. 38, par. 9—1), and intent to kill or do great bodily harm is one of the issues involved in such a charge.

Only two people really know what, if anything, went on in the defendant's car on February 10, 1972. Only the defendant is available to testify concerning those alleged events. Events which may be deemed to explain the reason for the commission of the crime are admissible, and trial courts should permit the introduction of an alleged conversation, subject to cross-examination, as an aid to the understanding by the trier of fact.

In *People v. Reddock* (2nd Dist. 1973), 13 Ill. App. 3d 296, 305, 300 N.E.2d 31, testimony of a conversation with a dead person was held to be admissible for showing the deceased's motivation for being at a particular location at the time the crime was committed. Likewise, in the case at bar, defendant's conversation with the deceased was admissible to show her motivation for pulling a gun on him.

While the State contends the testimony was legally incompetent because it was self-serving hearsay testimony of a conversation with a dead person, we disagree. A defendant must be allowed to present his version of the events immediately surrounding the crime with which he is charged so the jury may consider his defense. As noted in *People v. Carpenter* (1963), 28 Ill. 2d 116, 121, 190 N.E.2d 738: "The fundamental purpose of the hearsay rule was and is to test the real value of testimony by exposing the source of the assertion to cross-examination by the party against whom it is offered." In the case at bar, defendant attempted to offer testimony regarding a conversation with the decedent in which *he* told decedent he was breaking up with her. Defendant was on the stand subject to cross-examination; therefore, his version of the events immediately preceding decedent's death should have been allowed, leaving the issue of defendant's credibility to the jury.

The cases cited by the State can be distinguished from the case at bar. *People v. Himstedt* (1941), 377 Ill. 498, 502, 37 N.E.2d 165, dealt with a self-serving statement which the court found to be immaterial, and *People v. Colegrove* (1930), 342 Ill. 430, 440, 174 N.E. 536, concerned self-

---

[3] The *Peters* case involved a bribery conviction. For reasons unrelated to the point discussed in this opinion, *Peters* was overruled in *People v. Lyons* (1954), 4 Ill. 2d 396, 399, 122 N.E.2d 809.

serving statements made by the defendant sometime prior to the commission of the crime with which he was charged. *People v. Colletti* (2nd Dist. 1968), 101 Ill. App. 2d 51, 55, 242 N.E.2d 63, *cert. denied,* 396 U.S. 927, 24 L. Ed. 2d 255, 90 S. Ct. 259, involved hearsay testimony regarding an exculpatory statement allegedly made by a co-defendant which implicated the defendant. The case at bar involves a defendant's explanation of the events which allegedly took place immediately prior to the death of decedent. Defendant was subject to cross-examination, and the trial court erred in refusing to allow him to give testimony concerning his argument with the decedent.

■■ While we find this exclusion of testimony to be error, we do not find it is prejudicial error. As stated in *People v. Long* (1968), 39 Ill. 2d 40, 44, 233 N.E.2d 389, a defendant is not entitled to a perfect trial; rather the question is whether defendant had a fair trial, and if his conviction was based on evidence establishing his guilt beyond a reasonable doubt. *Cf. People v. Morgan* (1st Dist. 1974), 20 Ill. App. 3d 815, 314 N.E.2d 326 (abstract opinion); *People v. Smalley* (2nd Dist. 1973), 10 Ill. App. 3d 416, 423-24, 294 N.E.2d 305.

Defendant did testify in the case at bar as follows:

"During the conversation—during the conversation between Dovie and I, she went into my glove compartment after the thing that was said within that conversation that apparently annoyed her, and I supposed she was going in to get a letter—".

Defendant further testified instead of taking out the letter, decedent grabbed the gun he kept in the glove compartment and pointed it at him. Both the prosecutor and defense argued in closing that the decedent and defendant had been arguing in the car prior to the time decedent was shot. While closing argument is not evidence, it did put before the jury a possible explanation for the events which took place on the evening of February 10, 1972. Perhaps defendant in the rejected testimony could have expanded in greater detail. But the critical testimony from defendant's theory is that the parties had an argument, the decedent took a gun, a struggle followed, and the decedent was shot. In fact, defendant's argument to this court on this point is somewhat inconsistent with the argument in his brief as to point V of this opinion. As the defendant's brief sets forth in great detail, the defendant's testimony clearly established the incident was an accident. The jury obviously rejected the defendant's strong argument. We do not think the exclusion of this testimony under these circumstances was prejudicial error.

## B.

Defendant also sought to introduce testimony to explain his leaving the State of Illinois a few hours after the incident and going to Arkansas.

Defendant made an offer of proof that he went to Little Rock, Arkansas to see Angelo Johnson, a missionary with whom he worked and in whom he wished to confide the trouble he was in. Both parties agree testimony of flight, as well as defendant's motivation for flight, are admissible. (*People v. Autman* (1946), 393 Ill. 262, 267, 65 N.E.2d 772; *People v. Rappaport* (1936), 362 Ill. 462, 468, 200 N.E. 165; *People v. Montgomery* (1st Dist. 1973), 16 Ill. App. 3d 127, 133, 305 N.E.2d 627.) On direct examination of the defendant, the trial court sustained objections to questions seeking to elicit the purpose of defendant's trip to Arkansas. It is urged that defendant should have been allowed to attempt to prove that his leaving was prompted not by consciousness of guilt, but by emotions entirely consistent with innocence.

The State contends defendant was allowed to introduce testimony that his reason for going to Arkansas was to see Angelo Johnson, and the evidence that defendant had done missionary work with Johnson was properly excluded. After making his offer of proof, defendant was allowed to testify that he knew an Angelo Johnson who lived in Little Rock, Arkansas; and that when he did not get to see Angelo Johnson after his bus trip to Arkansas, he called the Chicago Police Department and reported the body in his basement apartment. In response to questions asked on cross-examination, defendant informed the jury that he tried to reach Reverend Angelo Johnson when he arrived in Little Rock, but was unable to do so, and then called the Chicago police.

■■ In *People v. Montgomery,* 16 Ill. App. 3d 127, 133, this court, in discussing the issue of flight, held the issue of subjective intent or an explanation of flight should be considered with all other evidence in determining the issue of guilt. On the basis of *Montgomery,* we agree that defendant should have been permitted the opportunity of answering the question as to why he went to Arkansas.

However, as in *Montgomery,* we do not think this erroneous ruling was prejudicial. The defendant did testify he went to Little Rock, and did testify that he sought to contact Johnson and was unable to do so, whereupon he called the Chicago police and advised them of the shooting and where the body of the deceased could be located. Whatever his purpose may have been for going to Little Rock, the fact is that having arrived there and not locating Johnson, the defendant voluntarily abandoned his mission and called the Chicago police.

## C.

On direct examination State witness Nellie Tillman testified regarding a February 9, 1972, telephone conversation between defendant and decedent in which she allegedly overheard the defendant threaten to get even with the decedent if it was the last thing he did. Defendant

attempted to impeach this testimony by introducing evidence of the witness's silence on this matter in her testimony given at defendant's first trial which resulted in a hung jury. The pertinent cross-examination follows:

"Q. * * * with reference to this telephone call, do you recall you testified in this matter at a previous time, * * *?

A. Yes.

Q. You never said anything in that testimony about this telephone call?

State: Objection.

Court: Sustained.

* * *

Q. Well, at the time you testified in this previous hearing did you testify as to everything you knew about Jasper Johnson's relationship with Dovie?

State: Objection* * *.

Court: Sustained."

At this point defendant abandoned his questioning concerning the telephone conversation. Defendant did not direct the witness to any specific testimony, where or when the testimony took place, or specific questions and answers from any previous testimony It is now urged that the trial court prejudicially restricted defendant's right of cross-examination.

We agree a witness may be impeached by his silence on the same matter during prior testimony. (*Ritzman v. People* (1884), 110 Ill. 362, 371.) Defendant suggests that in *Ritzman* our supreme court specifically rejected the notion that to lay a foundation for elicitation of a prior omission, it must be shown that a witness was questioned at the earlier hearing regarding the subject matter of the omission. In *Ritzman* the court said:

"We think, where a witness, on a second examination, as to a particular transaction, states an important fact omitted in his previous account of the matter, his attention, on cross-examination, may properly be called to the fact, and he be required to explain why the omission was made in his first statement." 110 Ill. 362, 371.

In *Larrance v. People* (1906), 222 Ill. 155, 160, 78 N.E. 50, in considering this question, the supreme court said:

"[B]ut the cross-examination should first have been addressed to showing that Henry Larrance was given an opportunity to testify in reference to these matters; that he was either interrogated about them specifically, or that he was directed, or invited, or given an opportunity to state all that was said and done at the time of the affray. [Citations.] Unless he was so specifically interrogated, or

was so directed, invited or given opportunity at the inquest, it was entirely immaterial whether he then made the same statements on this subject that he made on the trial in this case."

In *Rice v. Gulf, Mobile & Ohio R.R. Co.* (1st Dist. 1967), 84 Ill. App. 2d 163, 173-75, 228 N.E.2d 162, this court considered this question and discussed the *Ritzman* and *Larrance* cases. In *Rice* the witness on cross-examination was shown the transcript of testimony of a prior trial, was requested to review it, and was then asked questions about whether he had testified concerning certain matters at the previous trial. We held in *Rice* that under the circumstances there was no error in the cross-examination of the witness. But, in the case at bar, no transcript was handed to witness Tillman, and no foundation of any type was established to provide witness Tillman with the specific direction necessary for proper cross-examination of any witness. *Cf. People v. McMath* (1st Dist. 1968), 104 Ill. App. 2d 302, 315, 244 N.E.2d 330, *cert. denied,* 400 U.S. 846, 27 L. Ed. 2d 83, 91 S. Ct. 92.

■■ Defendant could have referred to the date and place of the prior testimony. Having failed to lay a proper foundation for impeachment testimony, the trial court properly sustained the State's objections.

### III.

At trial, a tape of the February 12, 1972, telephone conversation between defendant and Officer McShane was introduced and played to the jury. At the conclusion of the first playing of the tape, the State requested the tape be played a second time because the prosecutor thought the tape was "cloudy" and playing it through the second time would help the jury understand. Upon objection of the defendant, the trial court inquired if the court reporter understood the tape. The court reporter replied that there were a few places that could not be understood. The trial court then permitted the second playing. The tape was then impounded by the trial court and thereafter allegedly lost. Therefore, it is not available for our review.

The defendant urges that (a) since the trial court's purpose in allowing the tape to be replayed was to aid the court reporter, this should have been done outside the presence of the jury, and (b) it was error to allow the jury to hear the tape a second time.

The trial court has the duty to determine that properly admitted oral evidence is heard by the trier of fact. Consequently, it is not unusual for the trial court to permit the testimony of witnesses to be repeated in order to be clearly heard. Here the court reporter advised that in a few places the tape could not be understood. Counsel for defendant expressed agreement to the replaying of the first part. It must be assumed that the trial court concluded that the entire replaying was necessary.

■■ It is unfortunate that the questioned tape was not presented to this court for review. The appellant (defendant) in courts of review has the responsibility to properly preserve the record on appeal. (*People v. Smith* (1969), 42 Ill. 2d 479, 483, 248 N.E.2d 68.) Where the record is incomplete, a reviewing court, "(1) will indulge in every reasonable presumption favorable to the judgment, order or ruling appealed from, including the presumption that the trial court ruled or acted correctly, and (2) will resolve any doubt arising from the incompleteness of the record against the appellant." *People v. Fochs* (1st Dist. 1976), 40 Ill. App. 3d 966, 967, 353 N.E.2d 326, 328.

As we do not have the tape recording of the telephone conversation before us on review, we are unable to determine if the trial court abused its discretion in allowing the second playing of the tape. We must presume the trial court acted correctly. From our review of the colloquy and the comments of the court reporter, we think the trial court could have concluded that replaying the tape was necessary under the circumstances.

## IV.

Defendant contends the closing argument of the State was improper and prejudicial because: (a) the prosecutor improperly read from a transcript of the tape; and (b) the prosecutor's argument referred to evidence outside of the record. Neither of these objections were made in the trial court. Irregularities not objected to in the trial court are deemed waived unless they result in a denial of defendant's right to a fair trial. *People v. Dailey* (1972), 51 Ill. 2d 239, 243, 282 N.E.2d 129; *People v. Gillarm* (1st Dist. 1976), 41 Ill. App. 3d 174, 177, 353 N.E.2d 280, 283.

■■ With respect to alleged reading from a transcript of the tape-recorded telephone conversation between defendant and Officer Eugene McShane, defendant stated he shot the deceased. The simple answer to this point is that the record does not establish the prosecutor was reading from the transcript. No objection was made during oral argument, and no issue was raised on this point in the detailed written motion for a new trial. We have reviewed the final argument and compared the same with the transcript of the testimony on this point. We are satisfied no prejudicial error occurred.

Defendant's objection to the prosecutor's reference in the closing argument to a letter found in decedent's purse is unfounded. Defendant contends that his letter to the decedent dated February 10, 1972, was not admitted into evidence at trial. The purse in its entirety was introduced into evidence without any objection or limitation. Decedent's mother viewed the contents of the purse before identifying it as decedent's. Defendant had every opportunity to object to the introduction of the

contents of the purse when the purse was offered into evidence, but failed to do so. When the purse was sent to the jury without objection, the purse could be considered in its entirety. Under these circumstances the prosecutor's remark concerning this purse recovered from the automobile, and the letter that was found therein—not in the glove compartment—was proper.

It should also be noted that in defendant's detailed written motion for new trial, this issue was not raised. As we have indicated earlier in this opinion, the point is thus waived.

## V.

Defendant claims it was error for the trial court to refuse to instruct the jury as to the defense of accident. Defendant contends his testimony established the decedent pulled a gun from the glove compartment of his car and aimed it at him, a scuffle followed, and the gun in decedent's hand discharged. In support of his theory defendant submitted a non-IPI instruction that if the shooting was found to be accidental, the jury should find the defendant not guilty.

■■ The defendant correctly argues that the jury must be instructed regarding defendant's theory of the case. However, that instruction does not need to be a separate instruction. *People v. Puckett* (1st Dist. 1972), 6 Ill. App. 3d 206, 210, 285 N.E.2d 258, involved an identical argument. This court noted the IPI instruction regarding the elements of murder adequately covered Puckett's defense of accident. Likewise in the case at bar, the general instructions on the issues of murder (IPI—Criminal Nos. 7.01, 7.02) were given. Based on those instructions, if the jury found the decedent's death was an accident, they could not find defendant guilty of murder. On the other hand, if the jury believed there was no accident, it was necessary, in order to sustain the charge of murder, that the State proved beyond a reasonable doubt the elements set forth in IPI—Criminal No. 7.02. It was not error to refuse to give a separate instruction on defendant's defense of accident.

## VI.

Defendant strongly urges that he was not proved guilty beyond a reasonable doubt. As noted in *People v. Hubbard* (1973), 55 Ill. 2d 142, 147, 302 N.E.2d 609, citing *People v. Glover* (1971), 49 Ill. 2d 78, 84, 273 N.E.2d 367:

> " ' It is axiomatic that it is the function of the trier of facts to determine the credibility of the witnesses, and its finding of guilty will be disturbed only when the evidence is so unsatisfactory as to leave a reasonable doubt as to defendant's guilt.' "

The record in this case reveals sufficient facts to support the jury's verdict. There is no question from the record that defendant was involved with

the deceased on the night she was last alive. The defendant told a Chicago police officer that he shot decedent. Both decedent's mother and brother testified concerning bruises which decedent suffered, and the mother testified defendant had admitted inflicting these bruises on decedent. The mother also testified she had overheard defendant threatening the deceased on the day before the incident.

Defendant's own testimony was impeached by the photographs taken at the time decedent's body was discovered in defendant's apartment. Defendant claimed he left her on the bed wearing her coat. The pictures showed the coat was thrown on a chair in the corner of the room and decedent was naked from the chest down. While defendant could not recall if he locked the door to his apartment when he left, and suggested someone else might have entered the room and removed decedent's clothing, this conflict was a matter to be considered by the jury, and they were not bound to believe defendant's story.

Defendant also testified he left the gun which killed decedent in a brown bag on the television set in his room. On the other hand, Ted Clemons, who talked to defendant on the telephone while defendant was in Arkansas, stated defendant told him he had done away with the gun and no one would find it. While the photographs taken at defendant's apartment on February 12, 1972, indicate there was a television in the corner of the room, defendant's mother claimed there was no television set there when she went to claim defendant's belongings. No one ever discovered a paper bag with the murder weapon. The letter which defendant alleged the decedent was going to take out of the glove compartment when she took the gun instead was not found in the glove compartment of the car, but in the purse of the deceased. Also, defendant who was admittedly having a fight with decedent, told her to go in the glove compartment and take out a letter, when admittedly he knew the gun was in the glove compartment. Also, defendant's description of the struggle between himself and decedent is difficult to accept. According to the defendant, he was sitting to the left of decedent, she held a gun pointed at his head in her right hand, the defendant grabbed decedent's right wrist with his left hand, a struggle ensued, and decedent was wounded by a bullet entering her left temple. Rather than take her to a hospital or immediately seek help, he took the deceased to his apartment and left for Arkansas.

The jury obviously found defendant's testimony unbelievable, and we think correctly. We find the evidence in this record supports the verdict finding defendant guilty of murder beyond any reasonable doubt.

## VII.

As noted earlier in this opinion, there is a conflict in the record as to whether defendant was sentenced to a term of 15 to 25 years or 15 to 45

years. The common law record indicates the defendant was sentenced to 15 to 25 years and judgment was entered thereon. The transcript clearly indicates that the trial court stated the defendant was sentenced to "* * * a period of not less than fifteen nor more than forty-five years." In fact defendant's notice of appeal notes the sentence is 15 to 45 years.

Supreme Court Rule 615 (Ill. Rev. Stat. 1975, ch. 110A, par. 615) sets forth that on appeal this court may "(1) reverse, affirm, or modify the judgment or order from which the appeal is taken." We are satisfied that the trial court sentenced the defendant to a period of 15 to 45 years. We are equally satisfied the defendant, when he filed his notice of appeal, understood the sentence was 15 to 45 years. We find nothing in the record to support the common law record. Pursuant to Rule 615 we are directing the Clerk of the Circuit Court of Cook County to correct the common law record so as to indicate that the sentence of the defendant is 15 to 45 years. In all other respects the judgment is affirmed.

Judgment affirmed as modified.

STAMOS, P. J., and JIGANTI, J., concur.